```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -

 4
      iCEUTICA PTY LTD and IROKO    :   CIVIL ACTION
 5    PHARMACEUTICALS, LLC,         :
                                    :
 6                   Plaintiffs,    :
                                    :
 7         vs.                      :
                                    :
 8    NOVITIUM PHARMA LLC,          :
                                    :
 9                   Defendant.     :   NO. 18-00599-CFC


10

11                          - - -

                            Wilmington, Delaware
12                          Thursday, February 7, 2019
                            12:25 o'clock, p.m.
13                          - - -

14
      BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.
15                          - - -

16
      APPEARANCES:
17
                    FISH & RICHARDSON P.C.
18                  BY:  MARTINA TYREUS HUFNAL, ESQ.

19
                         -and-
20

21

22

23
                                    Valerie J. Gunning
24                                  Official Court Reporter

25
```

1    APPEARANCES (Continued):

2

3                    RICHARDS, LAYTON & FINGER, P.A.
                     BY:   STEVEN F. FINEMAN, ESQ.

4

5                              -and-

6                    AXINN, VELTROP & HARKRIDER
                     BY:   DAVID H. SILVERSTEIN, ESQ.

7                          (New York, New York)

8

9                          Counsel for Defendant

10                             -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2

3              (Proceedings commenced in the courtroom,

4    beginning at 12:25 p.m.)

5

6              THE COURT:  Welcome.  Do you want to go first, I

7    guess?  Wait.  You have not signed in yet.  We'll wait until

8    you all sign in.

9              (Pause.)

10             THE COURT:  Go ahead.

11             MS. HUFNAL:  Thank you, Your Honor.  Martina

12   Hufnal from Fish & Richardson for the plaintiffs.

13             Given the time constraints I understand that are

14   here, I'm just going to dive right into the substantive

15   issues or issue in this dispute.  If Your Honor would like

16   any background on the parties, I'm happy to answer those

17   questions.  But fundamentally, it's a Hatch-Waxman case and

18   plaintiff sells the branded version of the drug and the

19   defendant is going to come on the market with a generic

20   market, and that initiated this lawsuit.

21             So as with any typical patent litigation or

22   Hatch-Waxman litigation, we served some discovery requests

23   on the defendant and we received four categories, we have

24   received four categories of documents.  They're ANDA, which

25   they're required to give us.  They're correspondence with

1    the FDA, samples, which we had asked for in our requests.

2    And now we recently have some lab notebooks kind of

3    filtering in this past month.  That is a very narrow group

4    of types of documents that we sought in our discovery

5    requests, and we have made no more movement on getting

6    additional types of documents.  When I say "types of

7    documents, I mean e-mails, for example, PowerPoint

8    presentations, internal reports that they may have generated

9    about their development.  Those are the types of documents

10   that we are seeking discovery into.

11            And we set out the long, lengthy correspondence

12   back and forth that we've had on these issues and we think

13   that we have tried, made efforts to try to narrow the issues

14   and narrow the scope of discovery, and none of it has proved

15   fruitful.

16            And just to be fundamentally -- we're seeking

17   discovery, so while we're going to talk about relevance, I'm

18   happy to engage in the discussion of what type of document

19   we think is relevant and why we are seeking these discovery

20   requests.  We are not obviously at the point where we can

21   talk about whether a particular document is relevant to the

22   issue of the case because I'm arguing blindfolded.  I don't

23   have any of these documents yet.

24            So the standard set out is in Rule 26, Your

25   Honor, that we may obtain discovery regarding nonprivileged

1    matters relevant to any claim or defense proportional to the

2    needs of the case.  I think, although I would be interested

3    to hear what defendant says, it's a little bit of a moving

4    target whether they're saying they're not relevant or it's

5    an undue burden on them.  So I'm happy to address either of

6    those.

7              I thought it might make sense and be helpful to

8    the Court to explain some of the types of documents that we

9    might find if we get some ESI from the defendants and how

10   those are relevant to the claims and defenses in the case.

11             So, for example, there's a claim construction

12   dispute.  We have a claim construction hearing coming up,

13   and one of the issues is the Meloxicam is the active

14   ingredient in this case, and the claims talk about particle

15   sizes of the Meloxicam.  One of the claim construction

16   issues is whether or not those particles have to be pure,

17   100 percent pure Meloxicam.

18             Another dispute I think, noninfringement

19   argument of theirs is going to be whether or not they even

20   have particles of Meloxicam.  We certainly would be

21   interested in the discovery of their internal reports, their

22   e-mails, their discussions back and forth about how they

23   refer to their formulation, whether they refer to them,

24   their formulation as having particles, whether they refer to

25   their formulations being 100 percent pure, which is what

1     they are saying the claims require or not, and if they're

2     not, why.

3             THE COURT:  Let me just ask you.

4             MS. HUFNAL:  Yes.

5             THE COURT:  That information, the purity, the

6     existence of particles would not be in the ANDA?

7             MS. HUFNAL:  ███████████████████████

8     ████████████████████  And we'll inevitably have experts in

9     this case and discussions about how their formulation was

10     developed, whether or not they tried to insert, for example,

11     the excipient or some impurities into their particles or

12     not.  I mean, ████████████████████████████████

13     ████████████████████████████████████

14     ████████████████  and what they are trying to read into

15     the claims is this exact 100 percent pure Meloxicam particle

16     so that there can't be any impurities in there.  ███████

17     ███████████████████████████

18             THE COURT:  If they were testing various levels

19     of purity or using or not using particles in trying to

20     develop what they've ultimately sought the ANDA for, does

21     that constitute infringement?

22             MS. HUFNAL:  It would constitute infringement if

23     they're -- well, our position in the claim construction is

24     it doesn't have to be 100 percent pure.

25             THE COURT:  What I just want to know is whether

1    that would be infringement if in the development of the

2    product for which they are ultimately seeking FDA approval,

3    they happen to use whatever purity level you contend the

4    patent covers or whatever particle it covers.  Would that be

5    infringement?

6              MS. HUFNAL:  I think it would be relevant to the

7    issue of proving infringement, which is, of course, our

8    burden, to prove in this case.

9              THE COURT:  You wouldn't take the position --

10   I'm assuming you wouldn't take the position that that would

11   be infringement?

12             MS. HUFNAL:  No, no.

13             THE COURT:  Okay.  So therefore isn't really all

14   that matters for infringement what ultimately is described

15   in the ANDA application?

16             MS. HUFNAL:  Not exactly, Your Honor.  The

17   issue, and I think this is set out in the Glaxo decision.

18   What infringement is determined around is the product that's

19   ultimately going to be sold to the market.  But, yes, the

20   ANDA is clearly very important.

21             THE COURT:  Artificial infringement based on

22   what's in the ANDA?

23             MS. HUFNAL:  It's an artifical act of

24   infringement.  Filing of the ANDA is the act of

25   infringement.

```
 1                    THE COURT:  Right.  But the act of infringement,
 2      meaning what is disclosed in the ANDA, is what we look to to
 3      determine whether or not there's infringement or not?
 4                    MS. HUFNAL:  No.  So whether or not there's
 5      infringement is determined based on the product that
 6      ultimately is going to be sold, which is why you often can
 7      get samples and test the samples, because the ANDA doesn't
 8      always have --
 9                    THE COURT:  That disclosure requirement?
10                    MS. HUFNAL:  Yes.
11                    THE COURT:  Thank you for the clarification.
12                    MS. HUFNAL:  So our burden, of course, is to
13      prove infringement.  We will rely on the ANDA inevitably as
14      evidence of that infringement, but oftentimes, and I think
15      all the cases cited by both sides support the understanding
16      that there is evidence that's used to prove infringement.
17      Of course, I mean, if you read their letter, they say, we've
18      given you everything to know noninfringement.  That's great
19      for them.  We have to prove infringement, and that's what
20      we're just seeking from discovery.  Maybe there will be
21      nothing.  I don't know.  But so far we have not been able to
22      understand legitimately why they can just deny us discovery,
23      just certain categories of documents just because, you know,
24      it's e-mail or just because it's a PowerPoint presentation.
25                    THE COURT:  So go ahead.  Something you would
```

1    expect to find then would be?

2              MS. HUFNAL:  Discussion about particles.  Do

3    their internal formulation people refer to these things as

4    particles?  Their defenses are now kind of litigation

5    inspired.  Whether or not they discussed measuring particle

6    size and decided not to, you know, for various reasons.

7    Commentary on testing that was done.

8              So, yes, we have the ANDA and they've begin us

9    lab notebooks.  Lab notebooks are problematic for a few

10   reasons.  One, we can't really tell who -- they are all

11   addressed to product development.  I think the issue is

12   product development.  They have some initials at the bottom.

13   But the discussions, which are usually like the fruitful

14   piece of information, when people are e-mailing back and

15   forth and saying, hey, I ran this test and this is what I

16   found and we're not privy to any of that, we can't get

17   discovery into any of that.  And that may be relevant to

18   another issue in the case, which is related to doctrine of

19   equivalents.

20             So we have asserted infringement, both literal

21   infringement and doctrine of equivalence.  I apologize if

22   Your Honor is already familiar with --

23             THE COURT:  You cannot insult me talking about

24   patent law, believe me.

25             MS. HUFNAL:  For doctrine of equivalence is, the

1    literal the claim has one, two three elements, and the

2    product meets all three literally.  Doctrine of equivalence

3    is maybe the product does not have element two, but what it

4    has is insubstantially different than what the claim

5    requires.  That can still be infringement under the doctrine

6    of equivalence.  And we have asserted that, problem related

7    to the particle size and the particle issue.

8            The discovery into whether or not what they

9    think they have is insubstantially different into -- from a

10   particle.  Maybe they designed around to try to not meet the

11   particle limitation.  Just discovery that we seek at this

12   point that is relevant to our claims of infringement.

13           Another thing on the test, commentary on the

14   testing, we'll have experts.  Our expert is going to run

15   some tests.  I assume their expert is going to say that our

16   expert didn't do things right or used the wrong tests or

17   whatever.  It would be interesting if their internal people,

18   what types of testing their intern people did.  That goes to

19   credibility.  It goes to credibility of the parties, of the

20   experts.  Again, just discovery into these things.

21           And then a big one is inducement.  And there's

22   some case law that was cited on this issue.  So we have

23   asserted, we have some method claims, and because of that,

24   we asserted induced infringement, saying that Novitium is

25   inducing doctors and pharmacies to infringe by giving their

1    generic product to patients.

2              THE COURT:  Right.  But it's not out there yet.

3    Right?

4              MS. HUFNAL:  No, but we still have that claim

5    for induced infringement.

6              THE COURT:  Explain that to me.  If you are not

7    actually selling the product, how do you have induced

8    infringement?

9              MS. HUFNAL:  We're going to show that they

10   intend for doctors to be prescribing this drug.

11             THE COURT:  Right.  But don't you have to have

12   for inducement actual infringement by a third party?

13             MS. HUFNAL:  Not under the -- not under the

14   framework of the Hatch-Waxman.

15             THE COURT:  So it actually has an ANDA, specific

16   carveout?

17             MS. HUFNAL:  It might be a declaratory judgment.

18   There a claim for declaratory judgment with the

19   infringement.

20             You caught me on a question here.  It might be

21   that we filed a DJ, or that 271(e) -- can I get back to you

22   on that?  It might be that 271(e) has a provision for

23   contributory -- for inducement of infringement based on the

24   filing of the ANDA because the product will be, you know,

25   distributed by doctors.

1          THE COURT:  Okay.  I would be interested in

2     that.

3          MS. HUFNAL:  I will confirm that with you.  But,

4     nevertheless, they currently have a cause of action that

5     they have not moved to dismiss.  It's in the case.  What we

6     would need to prove as set out again in several of these

7     cases is that Novitium intends, we have to prove a specific

8     intent by Novitium to induce doctors and pharmacies to do

9     this.  And in the letter they said, well, you have our

10    label.  The label controls.  But a few things on that.  The

11    label is insufficient to show their intent.  We want to have

12    to get into their minds to show their intent.  And I would

13    be shocked if they didn't say, well, we just have to copy

14    the label.  That's what the FDA says.  Novitium, we don't

15    have any intent.  We don't care if doctors read this or not.

16          THE COURT:  Right.

17          MS. HUFNAL:  So, for example, for Cascada, that

18    they are contending their product is going to sell into our

19    market, that is evidence of their intent to induce the sales

20    of this.  That's just one example.

21          THE COURT:  Okay.

22          MS. HUFNAL:  There may be chatter or

23    forecasting.

24          THE COURT:  All right.

25          MS. HUFNAL:  So that is in a nutshell why we

1      think that we just want this discovery.

2              THE COURT:  Okay.

3              MS. HUFNAL:  And we have not seen any authority

4      to suggest that it's not warranted or that we can't get it.

5              THE COURT:  Got you.  Okay.  Thank you.

6              MS. HUFNAL:  All right.  Thank you, Your Honor.

7              THE COURT:  Mr. Fineman?

8              MR. FINEMAN:  Good afternoon, Your Honor.  Steve

9      Fineman from Richards, Layton & Finger on behalf of

10     Novitium.  It gives me pleasure to introduce David

11     Silverstein from Axinn Veltrop.  With the Court's

12     indulgence, Mr. Silverstein will address the Court today.

13             THE COURT:  All right.  Thanks.  One second.

14     Okay.  Welcome.

15             MR. SILVERSTEIN:  Good afternoon, You Honor.

16     David Silverstein on behalf of defendant Novitium.

17             If I can just back up for a moment, as Your

18     Honor pointed out and put in more context, Your Honor is

19     absolutely correct, a Hatch-Waxman case is very different

20     than your typical patent infringement case.  It's all about

21     the ANDA.  The reason why they're able to sue us now even

22     though we're a good number of months, if not longer, from

23     coming onto the market and the reason they have standing to

24     do so is because there will be artificial acts of

25     infringement, which is, under the statute, filing of the

1    ANDA.

2              And the reason that Congress set the scheme up

3    is because the ANDA defines the product, nothing else.

4    Unlike the Apple v. Samsung case where, day by day, on the

5    fly, the alleged infringing product can change, with respect

6    to pharmaceuticals, they're highly regulated.  The metes and

7    bounds of what we're able to make the product as, what we're

8    able to label it as is confined within itself.  It all has

9    to be reviewed by FDA.  It has to be approved by FDA.

10   Pharmaceutical manufacturers are forbidden from deviating

11   from the description of the product in the ANDA itself.

12             Now, in order --

13             THE COURT:  But you'd agree with what Ms. Hufnal

14   said, that for infringement in these cases, start getting a

15   little bit tweaked, right, and then plaintiff has to kind of

16   readjust in the middle of litigation to prove infringement

17   based on the latest tweak?

18             MR. SILVERSTEIN:  Well, I mean, we're speaking

19   hypothetically.  ████████████████████████████████

20   ████

21             THE COURT:  Right.  But I'm saying if it does

22   change.

23             MR. SILVERSTEIN:  Right.

24             THE COURT:  I mean that's one of the issues that

25   people have to deal with in ANDA cases a lot.  Right?

1          MR. SILVERSTEIN:  Your Honor, this is highly

2     speculative.  If there were in a case, pharmaceutical case a

3     change in formulation, it would have to be proposed to FDA,

4     so it would appear in FDA correspondence, which has all been

5     produced in this case, and FDA would have to approve or

6     disapprove of that change.  And so there have been

7     Hatch-Waxman cases where some course adjustment has been

8     made by the litigants, ████████████████████████ Your

9     Honor.

10          What we proposed is the ANDA itself, all the FDA

11     correspondence, even subsequent to filing the ANDA.  We've

12     produced all of the lab notebooks, which constitutes the

13     entirety of the detailed and extensive testing that

14     defendant Novitium has conducted on the product.  In

15     addition, as Your Honor may or may not be aware, a required

16     component of every ANDA is a product development report,

17     which is a narrative that explains to FDA every prototype

18     considered, every test considered, why changes were made,

19     and how you eventually arrive upon your final formulation

20     for the product, because FDA, from their viewpoint, wants to

21     understand, why are you including these excipients, why are

22     you including it in this way?  What is their purpose, what

23     is their function?

24          In order for FDA to approve the product, they

25     need to understand how it works and exactly what the product

1    is, and so there is no leeway as far as making tweaks

2    without going through that formal process.

3                THE COURT:  So you're saying that basically they

4    should have everything they need to know about infringement

5    by looking at what was disclosed to FDA?

6                MR. SILVERSTEIN:  Absolutely, Your Honor.  And

7    there are cases where that's all that's permitted.  In an

8    effort to reach a compromise with plaintiffs and to avoid

9    burdening the Court with these disputes, we agreed to go

10   above and beyond.

11               We voluntarily gave them samples, more than they

12   requested, over 500 capsules.  They're free to test those.

13   They've had them since December.  So to the extent --

14               THE COURT:  You mentioned there's case law.  Do

15   you know of a Delaware case?

16               MR. SILVERSTEIN:  I don't have one offhand, Your

17   Honor.  There's certainly, depending on the complexity of

18   the case and the needs of the case, you know, there's

19   discovery that's permitted.  Also in cases where the

20   invalidity, for example, is the only issue, discovery has

21   been limited to the ANDA itself.  But in our case, the

22   narrow issues before you are just on infringement, and as I

23   said, everything must and is included in the ANDA itself.

24   In addition, they have all the underlying testing.  They

25   have the samples they can test themselves.  Their expert can

1    test them any way they want.

2             In addition, the ANDA itself is the best

3    evidence.  I mean, they are actually on a fishing expedition

4    with the hopes of finding something that contradicts the

5    ANDA.

6             THE COURT:  Okay.

7             MR. SILVERSTEIN:  But even hypothetically if

8    there were something that contradicts the ANDA, it's of no

9    moment.  We can't sell what's on a scrap of paper in

10    someone's drawer.  We can only sell what's described in the

11    ANDA itself.

12             THE COURT:  Do you have an inducement claim, an

13    induced infringement claim at this juncture?

14             MR. SILVERSTEIN:  Again, Hatch-Waxman cases are

15    a little bit specialized.  They're different than typical

16    patent cases.

17             THE COURT:  I get that.

18             MR. SILVERSTEIN:  In these Hatch-Waxman cases,

19    there's no willful infringement, so all of this inquiry of

20    intent --

21             THE COURT:  Inducement.  Well, wait.  There's

22    induced infringement for ANDA cases.  Right?

23             MR. SILVERSTEIN:  There's no willful

24    infringement.  The flavor of inducement that appears, is

25    permitted in, to be explored in Hatch-Waxman cases is

1    confined to the label itself.  Does the label induce others

2    to infringe the patent?

3              THE COURT:  So there's no specific intent

4    requirement?

5              MR. SILVERSTEIN:  Not that I'm aware of.  And we

6    cited cases in our brief.  It's the label that controls the

7    inquiry.

8              THE COURT:  All right.

9              MR. SILVERSTEIN:  Now, don't take my word for

10   it.  In their own brief they say there's even this

11   discovery, "to explore what may or may not be ultimately

12   relevant to this case."

13             THE COURT:  Right.  Okay.

14             MR. SILVERSTEIN:  That's not the right standard

15   here, Your Honor.  The correct standard here is

16   proportionality to the needs of the case.  Given the

17   discovery that the defendants have provided, we have nothing

18   to hide.  We hope to test their samples and see what we've

19   confirmed for ourselves, which is no infringement particles.

20   And given the burden to Novitium, that discovery is not

21   warranted.

22             Now, we've never conceded or agreed that there's

23   a lack of, or that there is relevance to the infringement

24   they're seeking.  We've disputed that.

25             THE COURT:  You never conceded?

1          MR. SILVERSTEIN:  We've never conceded.

2          THE COURT:  Right.

3          MR. SILVERSTEIN:  Our position has been

4    consistent all along.  In fact, beginning with the

5    scheduling conference in this case, which was overseen by

6    Judge Burke.  Our position is these other documents, not

7    relevant to the case, particularly in light of our

8    willingness to produce the ANDA and FDA correspondence, and

9    that in addition, the burden that's placed on Novitium of

10   having to collect, and the monetary expense and the

11   resources with regard to producing them, there's no

12   justification for producing them in this case.

13          THE COURT:  All right.

14          MR. SILVERSTEIN:  Another category that was

15   mentioned by my opposing counsel here was that there may be

16   design-around efforts in these documents, but the

17   design-around efforts would be privileged.  They wouldn't be

18   discoverable anyway.

19          THE COURT:  Well, I lost you on that one.  I

20   mean, I guess attorneys are involved in communications.  If

21   there's an attorney involved --

22          MR. SILVERSTEIN:  Certainly, any communications

23   with attorneys, any work done at the behest of the attorneys

24   would be covered by privilege if not work product usually.

25   So to the extent there are documents they're hoping to

1    obtain about, you know, interpreting the scope of the

2    patent, what does it mean, how do we design around it, none

3    of that would be discoverable.

4                    And so, and one final comment on the inducement.

5    What they are seeking boils down to, really they're seeking

6    willful infringement.  As I said, Your Honor, it has no

7    place in a Hatch-Waxman case.

8                    THE COURT:  All right.  Thank you.  Anything

9    else, Ms. Hufnal?

10                    MS. HUFNAL:  Very briefly.  I want to clarify on

11   the induced infringement that is in the complaint.

12   Declaratory judgment, our count of declaratory judgment of

13   inducement.

14                    So we are asking the Court for a declaratory

15   judgment when this product goes on the market, Novitium will

16   be inducing infringement, because --

17                    THE COURT:  Okay.

18                    MS. HUFNAL:  And on the issue of inducement, I

19   would just point Your Honor to the AstraZeneca case that's

20   cited in the briefing, 633 F3d. 1042, and specifically at

21   page 1058.  And the Federal Circuit is addressing another

22   allegation of induced infringement and says very clearly

23   that we need to show the specific intent to prove inducement

24   and the label is evidence that goes towards the inducement

25   of infringement.

1            THE COURT:  That's an ANDA case?

2            MS. HUFNAL:  Yes.  A Hatch-Waxman case.

3            Another case I would just point the Court to

4    based counsel's comments on is the Glaxo versus Novopharm,

5    also cite in the briefing.

6            I think Mr. Silverstein started off with a

7    position that Hatch-Waxman cases are very different from

8    other patent cases, and the Federal Circuit has explained

9    that is not the case.  They're actually just like a patent

10   infringement case.  We bear the burden.  We have to prove

11   infringement.  The ANDA, this case goes on to explain this

12   ANDA is one piece of evidence.  It's not the sole piece of

13   evidence.  And I actually, you know, looking out at cases

14   they recite in their papers, have not found any case that

15   supports the proposition that a generic company only has to

16   produce their ANDA.  And, in fact, I think all of the cases,

17   the Federal Circuit doesn't go through all of the evidence

18   to present to the trial court, but they talk about the ANDA,

19   the FDA correspondence and other evidence that was adduced

20   at trial.

21            THE COURT:  Your proposed order, it's just --

22   it's fairly broad.  I could sign it, but there was

23   renegotiation about trying to narrow that?

24            MS. HUFNAL:  So, Your Honor, we believe --

25            THE COURT:  I've read your letter.

1               MS. HUFNAL:  Yes.

2               THE COURT:  I get there has been effort.  I'm

3 just saying --

4               MS. HUFNAL:  So we have fact discovery closing

5 in about two months, and in that time period have to do

6 depositions, of course.

7               THE COURT:  Right.

8               MS. HUFNAL:  I'm happy to, if Your Honor wants

9 to put some time limit the parties need to confer on, for

10 example, search terms and reach resolution within a week,

11 hopefully, we can do that.  We'll certainly try our very

12 best to reach resolution.  I'm not even sure that's how they

13 want to search.  Other than that, I don't know.  I agree.

14 We're in a little bit of a difficult position because

15 Novitium hasn't really been engaged in the discussions of

16 how we might be able to narrow.

17               THE COURT:  Okay.  All right.  I'm going to take

18 it under advisement, get something out shortly.

19               MS. HUFNAL:  Thank you.

20               MR. SILVERSTEIN:  Thank you, Your Honor.

21               (Hearing concluded at 12:49 p.m.)

22                   -  -  -

23

24

25